FILED
01/23/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 4, 2017

## IN RE NOAH S., ET AL.

**Appeal from the Juvenile Court for Coffee County**
**No. 16J-0667          Jere M. Ledsinger, Judge**
_____

### No. M2017-01228-COA-R3-PT
_____

This is a termination of parental rights case. The trial court terminated Appellant Mother's parental rights on the grounds of: (1) abandonment by willful failure to support; and (2) failure to substantially comply with the reasonable requirements of the permanency plan. Because Appellees did not meet their burden to show that Mother willfully failed to provide support for the children, we reverse the trial court's order as to the ground of abandonment by willful failure to support. The trial court's order is otherwise affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part, Reversed in Part, and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and W. NEAL MCBRAYER, JJ., joined.

C. Brent Keeton, Manchester, Tennessee, for the appellant, Julie C.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

### I. Background

This case concerns two minor children, Noah S. (d.o.b January, 2009) and Jade C. (d.o.b. December, 2009).[1] The children's parents are Brian S. ("Father") and Appellant

_____
[1] In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

Julie C. ("Mother").[2]  On August 7, 2014, the State of Tennessee Department of Children's Services ("DCS" or "Appellee") received a referral alleging that the children were abandoned based on their parents' incarceration.  At approximately 1:00 a.m., on the morning of August 7, 2014, the parents and both children were observed at a gas station near their home.  The parents were arguing and then separated, with Jade following Father and Noah following Mother.  Because Jade could not keep up with Father, who was walking into a field with a six-pack of beer, she returned to follow Mother.  Mother scolded the child for attempting to follow her -- telling her to "Get" and "Go Away."  Mother then walked away, leaving Jade alone in the field.  Bystanders attempted to talk to the child, but Mother "drove up and forced Jade to get in the car."  Mother "reeked of alcohol and the children were with her in the car" when law enforcement arrived on the scene.  Father was also intoxicated, and the children "appeared to be very thirsty and possibly hungry."  Both parents were arrested.  Father has an extensive criminal record for crimes involving domestic violence and assault.  Mother was arrested for driving on a revoked license, driving under the influence ("DUI"), and child endangerment.  The children were placed in state custody where it was determined that they had "significant delays in verbal abilities."

A permanency plan was developed on September 4, 2014.  The plan's goal was to return the children to their parents.  The plan required Mother to pay child support if ordered by the court, and (prior to any child-support order) to make a good-faith payment each month to the Child Support Receiving Unit.  Mother was also required to: (1) maintain regular contact with DCS; (2) maintain regular and positive visitation; (3) notify DCS of any changes in relation to visitation; (4) notify DCS of any changes in address, phone number, or employment; (5) complete and alcohol and drug ("A&D") assessment and follow the recommendations; (6) sign releases for DCS; (7) provide the family service worker with documentation of completed A&D treatment; (8) attend parenting classes, provide DCS with proof of completion of the classes, and apply the skills learned in the classes during visits with the children; (9) attend all court hearings and follow all court orders and /or probation requirements, including paying any fines arising from her legal issues.  Mother participated in the development of the plan and signed the criteria and procedures for termination of parental rights.  The trial court later added a requirement to the plan that DCS arrange a trauma assessment for Mother and that Mother complete the assessment.  The juvenile court held an adjudicatory hearing on September 25, 2014.  At the hearing, Mother did not contest the allegations in the dependency and neglect petition filed by DCS.  Based on the record and Mother's stipulation, the trial court entered an order on November 13, 2014, finding the children dependent and neglected.

A second permanency plan was developed on August 18, 2015.  In addition to the

---

[2] Father's parental rights were also terminated in these proceeding, however, he does not appeal.

requirements outlined in the initial plan, the second plan added the goal of adoption, and added requirements that Mother: (1) obtain and maintain stable housing; obtain a legal means of support; (2) provide DCS with proof of employment; (3) provide DCS with information regarding any roommates or paramours for background checks; and (4) submit to a mental-health assessment through an approved provider and follow all recommendations thereof. The plan was ratified on November 2, 2015. A third permanency plan was developed on July 7, 2016. The plan's goals and Mother's requirements under the third plan remained the same. The third plan was ratified on July 19, 2016.

On January 6, 2015, Mother received her second DUI conviction and her first conviction for driving on a revoked license. Mother was furloughed to Coffee County Drug Court. The drug court performed an A&D assessment and placed Mother in intensive outpatient "IOP" treatment.

Initially, Mother cooperated with her case manager and made progress toward reunification. Kimberly Rhodes, the DCS case manager for the children, testified that until the fall of 2015, Mother received Social Security Income ("SSI"), paid rent, retained housing, had a part-time job, attended intensive-outpatient treatment and Alcoholics Anonymous meetings, complied with her probation, and maintained contact with DCS. However, in September 2015, Mother became involved with a methamphetamine offender, whom she met at drug court. During this time, Mother began using methamphetamine and was convicted of a second offense of driving on a revoked-license. On October 27, 2015, she was convicted of violating her probation for failing a drug screen for alcohol and methamphetamine and not reporting to IOP treatment. Around this time, Mother also lost her SSI and her housing. On November 19, 2015, Mother tested positive for methamphetamine.

Mother began treatment at an inpatient facility on December 16, 2015. Although Mother allegedly completed this treatment on January 12, 2016, Ms. Rhodes testified, that despite DCS's request, Mother never provided DCS with documentation showing that she completed the program prior to trial. Mother testified that after she completed the inpatient program, she attended Alcoholics Anonymous and Narcotics Anonymous meetings, but she admitted that she never provided proof that she attended those meetings.

Mother's visitation with the children was consistent until fall of 2015, when Mother violated her probation and failed a drug screen. On April 22, 2016, Mother was involved in a domestic altercation with Father and his mother. Ms. Rhodes testified that Mother admitted that she, Father, and his mother had been drinking prior to the altercation. DCS suspended Mother's visitation.

To resume visitation, DCS required Mother to complete random drug screens and

to keep DCS informed of her living situation. At trial, Mother admitted that she was asked to complete a drug screen and knew that completion of a drug screen was required to resume visitation with the children. However, after April 2016, she failed to submit to a single drug screen. Mother blamed her failure to take the drug screen on a lack of transportation. The children's caseworker testified that she offered to come to Mother to administer the drug screen, but Mother would make-up an excuse as to why she could not meet. For almost the entire year preceding trial, DCS had very little contact with Mother. Although Mother blamed DCS for not contacting her, Mother testified that she never raised any complaints regarding visitation to the children's Guardian *ad Litem*.

In its petition to terminate her parental rights, DCS alleged three grounds against Mother: (1) abandonment by willful failure to support; (2) substantial noncompliance with the permanency plans; and (3) persistence of the conditions that led to the children's removal from Mother's custody. The trial court heard the petition to terminate Mother's parental rights on March 10, 2017 and April 25, 2017. On June 5, 2017, the trial court entered an order terminating Mother's parental rights. The trial court terminated Mother's parental rights on two grounds: (1) substantial non-compliance with the permanency plan; and (2) abandonment by willful failure to support. The trial court also found that termination of Mother's parental rights was in the children's best interests. Mother appeals.

## II. Issues

In her brief, Appellant raises five issues for review:

1. Did the trial court err in finding that the State had proven the ground of substantial non-compliance by clear and convincing evidence?

2. Did the trial court err in finding that the State had proven the ground of persistent conditions by clear and convincing evidence?

3. Did the trial court err in finding that the State had proven the ground of failure to pay child support by clear and convincing evidence?

4. Did the Department of Children's Services prove it made reasonable efforts towards reunification?

5. Did the trial court err in finding that the State had proven, by clear and convincing evidence, that termination of parental rights was in the best interest of the minor children?

Appellees raise an additional issue of whether this Court has jurisdiction to hear the case because Appellant did not sign the notice of appeal. In its recent decision, *In re*

- 4 -

*Bentley D.*, No. E1016-02299-SC-RDO-PT, 2017 WL 5623577 (Tenn. Nov. 22, 2017), the Tennessee Supreme Court held that the signature requirement contained in Tennessee Code Annotated Section 36-1-124(d), requiring the appellant to sign the notice of appeal, was satisfied by the appellant's attorney's signature on the notice of appeal. Here, appellant did not sign the notice of appeal, but his attorney did. As such, under the holding in *In re Bentley D.*, this Court has jurisdiction to adjudicate the appeal.

### III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person or entity seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. July 12, 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838

(Tenn. 2002).

## IV.    Grounds for Termination of Parental Rights

### A.    Insufficient Findings

Mother first argues that the trial court did not make sufficient findings to support termination of her parental rights on the grounds of abandonment for non-payment of support and persistent conditions.  Because the trial court did not rely on the ground of persistence of the conditions that led to the children's removal, we will not address the sufficiency of its findings on this ground.[3]  However, as to the trial court's termination of Mother's parental rights on the ground of abandonment by willful failure to support, Tennessee Code Annotated Section 36-1-113(k) requires the trial court to make "specific findings of fact and conclusions of law."  Concerning this ground, the trial court's order states only that the termination of Mother's parental rights is based on her "abandonment for non-payment of support."  Although the order contains a legal conclusion, it fails to support this conclusion with any factual findings.  The requirement that the trial court make specific findings of fact and conclusions of law is not a mere technicality; rather, compliance with Section 36-1-113(k) serves an important purpose. *See **White v. Moody**,* 171 S.W.3d 187, 191 (Tenn. Ct. App. 2004).  "Without such findings and conclusions, this court is left to wonder on what basis the court reached its ultimate decision." ***In re K.H.**,* No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at \*8 (Tenn. Ct. App. May 15, 2009) (quoting ***In re M.E.W.**,* No. M2003-01739-COA-R3-PT, 2004 WL 865840, at \*19 (Tenn. Ct. App. April 21, 2004).  Typically, when a lower court has failed to comply with Tennessee Code Annotated Section 36-1-113(k), the appellate courts remand the case with directions to prepare the required findings of fact and conclusions of law.  ***In re Audrey S.**,* 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).  However, any one of the nine statutory grounds for termination of parental rights listed in Tennessee Code Annotated Section 36-1-113(g) is sufficient to support an order terminating parental rights where termination is in the best interests of the child. *Id.* at 862 (citing ***In re D.L.B**.,* 118 S.W.3d 360, 367 (Tenn. 2003).  While such failure would normally necessitate a remand to the trial court, such is not necessary with this case because another valid ground for termination exists.  Accordingly, we reverse the trial court's finding of abandonment by willful failure to support.

### B.    Failure to Substantially Comply with the Permanency Plan

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of failure to substantially comply with the

---

[3] In its brief, DCS acknowledged the statutory requirement of the trial court to make "specific findings of fact and conclusions of law," and stated that it would proceed only on the ground of substantial non-compliance with the permanency plans.

requirements of the permanency plan. Tennessee Code Annotated Section 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan."

"[T]he permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." *In re C.S., Jr., et al.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id.* As discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002); *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548.

*Id.* at 656-57.

Here, the trial court specifically found that "the children came into custody due to the parents' intoxication and the instability in the home due to domestic violence." Therefore, the requirements that Mother address her substance abuse problems, obtain stable housing, and obtain stable income were reasonable and related to the basis for the

removal of the children from her custody.[4]  Thus, we turn to the question of whether Mother substantially complied with her requirements under the permanency plans.

The Tennessee Supreme Court as explained that

[s]ubstantial noncompliance is not defined in the termination statute.  The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial.  Black's Law Dictionary defines "substantial" as "[o]f real worth and importance."  Black's Law Dictionary 1428 (6th ed. 1990).  In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002).  In its order terminating her parental rights, the trial court made the following relevant findings concerning Mother's failure to substantially comply with the permanency plans:

[Mother] has failed to complete the substance abuse treatment required under the plans.  Initially [Mother] made significant progress towards reunification, and . . . at one point . . . she was on the verge of getting the children released on a trial home visit to her care.  However, she relapsed in the Spring of 2016 and was involved in a domestic altercation.

The court finds that since the children came into custody [Mother] has repeatedly experienced drug and alcohol problems.  She continued to be involved on-and-off with [Father] and testified that only in the past one month prior to trial had she realized that the relationship with [Father] was not healthy for her.

The court finds that at the time of trial [Mother] had only just begun gainful employment as a part time book keeper for a logging company which started two weeks before the initial trial and she was making only $200.00 per week.  There was inadequate explanation by [Mother] as to why she quit a better paying job at M-Tek. It appears she has only recently obtained housing.  Owing to [Mother]'s not communicating with the DCS case manager since July 2016, there was no information available to the court as to the suitability of this home.  [Mother] does not have a driver's license having lost the license due to habitual motor vehicle offenses.  The court finds that [Mother] has not demonstrated the ability to provide for the

---

[4] Mother does not challenge the reasonableness of the requirements set out in the permanency plans.

children as required under the plan.

> The court finds from the evidence that [Mother] has not substantially completed any of the major obligations of the permanency plan which were essential for reunification with the children. The court accordingly finds that she has not substantially complied with her obligations under the permanency plan and this non-compliance prevents safe reunification of the children with her at this time.

The record supports the trial court's findings. From our review, Mother made progress toward reunification through the summer of 2015. However, in the fall of 2015, Mother lost her SSI, lost her housing, and became involved with a methamphetamine offender. In November, 2015, Mother tested positive for methamphetamine. Although, Mother completed an inpatient drug treatment program, she never provided DCS with documentation showing that she was in compliance with the recommendation until it was presented at trial. Mother's visitation with her children could have been reinstated had she completed a drug screen. However, despite DCS's efforts, Mother repeatedly failed to submit to drug screens.

For almost the entire year preceding trial, Mother had very little contact with DCS. Mother contends that she called DCS many times to discuss her case, but her calls were never returned. DCS has no record of these calls. When questioned, during cross-examination, Mother admitted that she never made any complaint as to DCS's handling of the case to DCS or to the children's Guardian *ad litem*. From the totality of the circumstances and the record as a whole, we conclude that there is clear and convincing evidence to support the trial court's finding that Mother failed to substantially comply with the reasonable requirements of the permanency plans.

### C.   Reasonable Efforts

Mother asserts that DCS failed provided sufficient proof that it made reasonable efforts towards reunification. The Tennessee Supreme Court has held that "in a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent." ***In re Kaliyah S***., 455 S.W.3d 533, 555 (Tenn. 2015). Furthermore, as with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. ***Id.*** (citing ***In re Audrey S.,*** 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)).

Here, DCS made significant efforts to assist Mother. The children's case worker testified that she "put in more hours on this case than any other case I've had." At both permanency hearings, the juvenile court found that DCS "made reasonable efforts toward

finalizing the permanency goals" by providing or referring parenting classes, mental-health counseling for the parents, and A&D counseling. Mother misapprehends the role of DCS in making reasonable efforts. The affirmative duty to make reasonable efforts is not solely on the Department. The duty to make reasonable efforts is "a two-way street." ***State of Tennessee, Dep't of Children's Servs. v. S.M.D.,*** 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006). Thus, Mother had a corresponding duty to communicate with the Department and to actively cooperate in those efforts. *See **Id**.* As set out above, Mother failed to complete a drug screen or provide proof of her attendance at her inpatient treatment program or any follow-up care including attendance at Alcoholics Anonymous meetings. Mother simply did not avail herself of the help DCS provided her to reunify the family.

### D. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. ***In re Audrey S.***, 182 S.W.3d at 877. The focus shifts to the child's best interest. ***Id***. at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. ***Id***. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." ***Moody***, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child[.]

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Concerning the children's best interests, the trial court found:

a.  The children are in an adoptive home and have a strong bond with

- 11 -

their foster parents.

b.    The total disregard of the parents for the reunification process since July, 2016, as evidenced by their lack of visitation, lack of contact with DCS, and failure to pay child support throughout the time the children were in custody.

c.    There has been repeated instances of substance abuse and domestic violence by the parents before and since the children were placed in foster care.

d.    The court finds that the children are doing well in the foster home and that there has been significant improvement in the children's behavior and speech. The court finds persuasive the observation of one of the witnesses that the change in the children has been like night and day since entering foster care.

The record supports the trial court's findings regarding the children's best interests. As discussed in more detail above, despite DCS's efforts to assist her in reunifying the family, Mother failed to make an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in her home and failed to effect a lasting adjustment after reasonable efforts by DCS for such duration of time that lasting adjustment did not appear possible. Mother has failed to complete a drug screen, so as to show that her home would be a safe environment for the children. Mother has not shown any stability in her employment such that she would be able to support the children consistently. She has no evidence that these children have any bond with Mother.

The children have lived in their foster home for two years and seven months. The children's foster mother testified that when the children arrived at the home, they were dirty and had significant verbal delays. Noah "wasn't socialized" and "didn't talk much." Jade still wet her pants and wore pulls-ups. She could not count and did not know colors or letters of the alphabet. From the record, the children have thrived in their foster home. From the testimony, Noah is reading above grade level and he "talk[s] all the time." It is uncontested that the children have bonded with their foster parents, and that the foster parents intended to adopt the children. To remove the children from this stable home and place them with Mother, who has failed to demonstrate long-term stability and sobriety, would likely cause the children emotional and possibly physical harm. Accordingly, we conclude that the facts, as found by the trial court, are supported by the preponderance of the evidence and clearly and convincingly establish that termination of Mother's parental rights is in the children's best interest.

## V. Conclusion

For the foregoing reasons, we reverse termination of Mother's parental rights on the ground of abandonment by failure to support. The order is otherwise affirmed. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Julie C. Because Appellant is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE